MAXWELL, J„
for the Court:
¶ 1. Thomas Jones seeks a new trial. He was tried and convicted of sexual battery of a thirteen-year-old girl. On appeal, he complains that his trial was a “farce” and the jury’s verdict runs contrary to the weight of the evidence.
¶2. We see no farce. While Jones claims the jury was “tainted” by the possibility that a juror was predisposed to find him guilty, the record shows the court, the State, and Jones’s counsel thoroughly vetted the prospective jurors to ensure each understood the presumption of innocence. Jones also insists a sleepy juror entitles him to a new trial. But the record shows Jones’s trial counsel — while voicing concerns that a juror may have been sleeping — never asked the judge to remove the juror. And Jones has not shown how the judge abused' his discretion by not replacing the juror sua sponte.
¶ 3. We also fail to see how the weight of the evidence undermines the jury’s verdict. Jones’s evidentiary challenge boils down to claiming the jury members were wrong in their credibility assessments and resolution of conflicting evidence. But witness-credibility decisions and what weight to give the evidence are questions within the “exclusive province of the jury.”[1] This court only grants new trials in “exceptional cases,”[2] “where the evidence [i]s so extremely doubtful that it [i]s repulsive to the reasoning of the ordinary mind.”[3] And because the jury’s decision that Jones was guilty beyond a reasonable doubt was reasonable based on the evidence, and because allowing Jones’s conviction to stand *1063 would not “sanction an unconscionable injustice,” [4] we affirm.
Background
¶ 4. Jones was tried by a jury alongside his wife, Elizabeth. Jones had been charged with sexual battery by engaging in penetration of a child under the age of fourteen. Elizabeth had been charged with contributing to the delinquency of the minor, by permitting a minor to consume alcohol to the point of intoxication, which led to the minor being sexually abused.

I. Day of Battery

¶ 5. In September 2010, Jones and his wife drove down from Connecticut to Tuni-ca County, Mississippi, to visit Elizabeth’s sister, Rachel. Rachel lived with her husband, Andrew; their two infant sons; and Andrew’s thirteen-year-old daughter from a previous relationship, Bethany.[5] The four grown-ups and three children had all been staying in the same three-bedroom apartment for a week. And though Jones and Elizabeth had planned to stay several more days, when Bethany revealed she had been sexually abused, the couple immediately left for Connecticut.
¶ 6. The day of the attack, Jones, Elizabeth, and Bethany had gone to buy groceries and alcohol. Once back at the apartment, Elizabeth made homemade pizzas for supper, while her sister Rachel worked the night shift at a nearby hospital. When the adults began pouring drinks, Bethany asked her father if she could have one. Andrew consented, saying he would rather his daughter experiment at home than elsewhere. Andrew and Bethany testified that Elizabeth poured Bethany a tall glass of vodka and peach tea. But Elizabeth testified Bethany poured her own cocktail.
Andrew did not stay up to supervise his daughter’s drinking.
¶ 7. At some point that night, Bethany went outside to walk the dog. Bethany testified her step-aunt joined her. Shortly after, Elizabeth helped the increasingly inebriated Bethany back inside to the couch. But the young girl’s drinking did not stop. Jones told Elizabeth to fix Bethany another drink. And Bethany became so drunk that she vomited, and Elizabeth had to help Bethany to her bedroom.
¶ 8. Bethany testified “shortly after that, somebody came into the room, and I’m pretty sure it was Tommy [ (Jones) ]. And it felt like he was holding my wrists back, and I felt pain down there [ (between her legs) ].” When Bethany woke up the next morning, her genitals were “really sore,” and she noticed blood in her urine.

II. Aftermath

¶ 9. Andrew was at work when Bethany woke up. In fact, Jones had driven Andrew to work that morning, and the two men had made plans to grill out that night. But sometime mid-morning Bethany text-ed her father, telling him that she thought she had been raped and that “Uncle Tommy” was the one who did it.
¶ 10. After receiving the text, Andrew called his wife, who had already returned from work early that morning. Rachel asked Bethany to come into her parents room and tell her what happened. Rachel then told Bethany to keep herself locked inside their room until she returned. The plan was for Rachel to go get Andrew from work. But just as Rachel was about to leave, Jones told her that he and Elizabeth had received an emergency phone call. He said they had to return to Con *1064 necticut immediately. Rachel told them she had to go somewhere but would be right back and asked them to delay departing for their two-day trip until she returned. But instead of waiting, Jones and Elizabeth hurriedly packed their belongings and left.
¶ 11. By this point, Rachel and Andrew had called 911, and law enforcement began searching for Jones’s green Jeep Cherokee. The couple was located and pulled over before they could leave Tunica County. Inside their vehicle, sheriffs deputies found a duffle bag containing sex toys and condoms.

III. Investigation

¶ 12. Back at the apartment, deputies interviewed Andrew and Bethany. They then took Bethany to the hospital to take DNA samples. While none of Jones’s DNA was found on Bethany, her DNA was discovered on one of the sex toys.
¶ 13. Two months later, Bethany met with a forensic psychologist, who specialized in working with child sexual-abuse victims. The psychologist testified about her finding that Bethany’s interview was consistent with a child who had been sexually abused. The psychologist relayed what Bethany had shared in the interview — that Jones had come into her room and gotten on top of her, that she felt a sharp pain inside her, and that she thought it was Jones’s penis but was not certain.

IV. Defense

¶ 14. Both Elizabeth and Jones testified in their own defense. Both of their versions diverged from Bethany’s description of what happened at the point Elizabeth and Bethany returned inside from walking the dog that night. According to Elizabeth, she and Jones left the drunk Bethany on the couch, then went into Bethany’s room and had sex, during which they used a sex toy. They claimed they heard a thud out in the living room, so they stopped having intercourse to check on Bethany, who had fallen on the floor. This is supposedly when Bethany threw up. Elizabeth testified that Jones pulled Bethany up from the floor by her wrists and helped her to bed.
¶ 15. Once Bethany was in bed, Elizabeth decided to make more pizzas with the leftover ingredients. And while the pizzas were baking, she and Jones began having sex again-this time on the living room sofa. It was then, according to Elizabeth, that they realized they had left a sex toy in Bethany’s room. Elizabeth claimed she went back into the bedroom to retrieve the object, only to find it in a different spot than where it was left. While Elizabeth suggested Bethany had moved the object, on cross-examination she admitted that just thirty minutes earlier Bethany had passed out from drinking and was unconscious.
¶ 16. During Elizabeth’s testimony, the defense offered into evidence a letter Elizabeth had written to Rachel from jail. The defense also offered the sworn statement Elizabeth had given authorities four months after the sexual assault. In the letter, Elizabeth described vivid examples of Jones’s sexual deviance and abuse toward her. And in her statement, Elizabeth wrote that Jones had confessed to her, as they were being pulled over by police, that the reason they were being stopped was because he had sexually penetrated Bethany the night before.
¶ 17. On the stand, Elizabeth changed her story and said she had been lying when she wrote the letter and statement. She claimed she only wrote the letter so her sister would feel sorry for her and bail her out. And she said originally implicated Jones so charges against here would be *1065 dropped, which she hoped would help her regain visitation rights with her child in Connecticut.
¶ 18. Jones’s testimony about that night was very similar to Elizabeth’s.

V. Verdict

¶ 19. The jury found Elizabeth not guilty of contributing to the delinquency of a minor. But the jury found Jones guilty of sexual battery. He was sentenced to twenty-five years’ imprisonment.
¶ 20. Following the denial of his post-trial motion, Jones timely appealed. On appeal, he claims he is entitled to a new trial because the verdict was against the overwhelming weight of the evidence. He also suggests he was denied a fair trial because one potential juror thought he was guilty even before proven so and another empaneled juror had fallen asleep during trial.
Discussion

I. Weight of Evidence

¶ 21. Jones’s main argument is substantive — that the jury got it wrong based on the evidence.

A. Standard for Reversal

¶ 22. Because he claims the evidence also supported his theory of what happened, he urges this court as “thirteenth juror” should grant him a new trial if we tend to disagree with jury’s assessment of the evidence. Jones seizes on language from Bush v. State,. 895 So.2d 836, 844 (¶ 18) (Miss.2005), going so far as saying this court is “commanded” by the Mississippi Supreme Court to give no deference whatsoever to the jury’s guilty verdict or the trial court’s decision to deny a new trial. Nor should this court, according to Jones, even view the evidence in the light most favorable to the verdict.
¶ 28. After review, we are not swayed by his narrow interpretation of Bush, since it omits the bulk of what the supreme court said about the weight of the evidence in Bush and is contrary to our supreme court’s other more recent opinions.
¶ 24. In Bush, the supreme court made clear that the court’s role as the thirteenth juror was “limited.” Id. at (¶ 19). While the court does not have to accept all evidence in favor of guilt as true, id. at n. 3, we do have to view the evidence in the light most favorable to the verdict and may “only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Id. at (¶ 18). Moreover, motions for a new trial are “addressed to the discretion of the [trial] court,” which should invoke its power to grant a new trial “only in exceptional cases in which the evidence preponderates heavily against the verdict.” Id. Very recently, in Renfro v. State, 118 So.3d 560, 564 (¶ 14) (Miss.2013), the supreme court explained that the verdicts that have been overturned on appeal on weight-of-the evidence grounds were “based on extremely weak or tenuous evidence” — evidence “so extremely doubtful that it was repulsive to the reasoning of the ordinary mind.” (Citations omitted).
¶ 25. In Renfro, the supreme court made equally clear that appellate courts must defer to the jury’s credibility and weight-of-the-evidence assessments. Id. To Renfro’s dictates, we could also add: Nelson v. State, 10 So.3d 898, 905(29) (Miss.2009) (“The jury determines the weight and credibility of witness testimony.”); Harris v. State, 970 So.2d 151, 156 (¶20) (Miss.2007) (“It is well established that the jury is the sole judge of the credibility of the witness.”); Townsend v. State, 939 So.2d 796, 802 (¶27) (Miss.2006) (“As this Court has repeatedly held, the jury is the final arbiter of a witness’s *1066 credibility.”); and the pre-Bush opinion King v. State, 798 So.2d 1258, 1262 (¶ 14) (Miss.2001) (“The jury has a much better vantage point to view and assess the tone, mannerisms, and disposition of witnesses.”).
¶ 26. The bottom line is that the job of “weighing the credibility of witnesses is the exclusive povvince of the jury[.]” Renfro, 118 So.3d at 564 (¶ 14) (emphasis added and citations omitted). And the jury has the prerogative to “choose to believe one witness over another” and “draw such reasonable inferences from the evidence as it deems justified!.]” Id. So contrary to Jones’s suggestion, this court cannot overturn a jury’s verdict simply because we disagree. Rather, to reverse Jones’s conviction, we would have to find the evidence supporting guilt extremely tenuous, the inferences the jury made beyond reason, and the verdict reached unconscionable. See id. at 563-64 (¶¶ 13-14). With this proper standard in mind, we review the evidence against Jones.

B. Evidence Supporting the Jury’s Guilty Verdict

¶ 27. To find Jones guilty of sexual battery, the jury had to find beyond a reasonable doubt that Jones sexually penetrated Bethany, when she was under the age of fourteen and he was more than twenty-four months older than she, by inserting his penis and/or an object into her vagina. See Miss.Code Ann. § 97-3-95(l)(d) (Rev. 2006).
¶ 28. The jury heard undisputed evidence that on the night she was battered Bethany was two weeks shy of turning fourteen, while Jones was in his forties. The jury also heard uncontradicted evidence that forensic testing detected Bethany’s DNA on one of the sex toys found in Jones’s car the next morning.
¶ 29. For the evidence that was disputed, the jury got to choose which witnesses to believe. See Renfro, 118 So.3d at 564 (55714). Thus, the jury “was entitled to believe” Bethany’s testimony that, although she was drunk, she was sure she had been held down and sexually penetrated by Jones. See id. at (¶ 17). This testimony was corroborated by the forensic interviewer, who testified that Bethany was sure Jones had penetrated her, despite being unsure whether he used his penis or some object. With forensic evidence placing Bethany’s DNA on the sex toy, the jury could have reasonably inferred that Jones had used the object to penetrate Bethany. Cf. id. (finding jury “was entitled to draw a reasonable inference” that the defendant had a motive to commit the crime and in fact did commit the crime). The forensic interviewer also testified that she found Bethany’s behavior to be consistent with a child sexual-abuse victim.
¶ 30. Bethany’s testimony was also corroborated by Andrew, Rachel, and the investigating officers, who all testified that Bethany had told them the following morning she thought Jones had raped her. And Rachel testified about Bethany’s demeanor that morning — that Bethany appeared very “tearful” and “shocked,” as if something really wrong had happened. Additionally, Andrew and Rachel both testified that, before the rape, Jones and Elizabeth had planned to stay in Mississippi for a few more days — with Jones even discussing cooking on the grill that night. But as soon as Bethany told Andrew and Rachel what happened, Jones and Elizabeth suddenly bolted, refusing to delay their two-day drive for even the few minutes it would have taken Rachel to pick Andrew up from work. So the jury could have reasonably inferred the reason Jones and Elizabeth left so abruptly was to flee Mississippi and evade arrest.
*1067 ¶ 31. Elizabeth too corroborated Bethany’s testimony through the sworn statement introduced by the defense without limitation. In this statement, Elizabeth said Jones had confessed to her that he had sex with Bethany the night before their arrests.
¶ 32. While Elizabeth and Jones both later contradicted Bethany, the jury was free to resolve the competing evidence as they saw fit. Cf. id. Assigning little weight to Elizabeth’s testimony was not unreasonable, given that she asked the jury to disregard her letter and sworn statement, both of which she claimed contained made-up stories to manipulate her sister and the police into helping her.
¶ 33. Viewing this evidence in the light most favorable to the verdict, as we must, there is plenty of evidence supporting Jones’s guilt. Simply put, the evidence of Jones’s guilt is not outweighed by evidence supporting acquittal, the inferences the jury made were not unreasonable, and the verdict is not unconscionable. Thus, the trial judge properly denied Jones’s motion for a new trial.

II. Presumption of Innocence

¶ 34. Jones remaining two arguments are procedural — that two things happened at trial that interfered with his right to a fair trial.
¶ 35. According to Jones’s appellate counsel,[6] something “most troubling” transpired during voir dire. He asserts a veni-re member with a predisposition to find Jones guilty may have made it onto the panel.
¶ 36. In seeking reversal on this point, Jones asks this court to solely focus on something that is not in the record — the identity of a prospective juror who answered “guilty” during voir dire. We, however, have read what is in the record. And the voir dire transcript shows Jones’s trial counsel, the State, and the court were thorough in their efforts to ensure all potential jurors understood Jones was “not guilty” until proven otherwise.

A. The Venire Understood the Presumption of Innocence

¶ 37. During voir dire, the assistant district attorney discussed with the venire the presumption of innocence. He rhetorically asked, “If y’all had to go back there and vote right now, how would you vote now?” A prospective juror replied, “Guilty.” Jones claims that because this juror was not identified on the record, there is no way to know who he or she was or if he or she was empaneled on the jury. And because there is a possibility that a member of the jury disagreed with the presumption of innocence, Jones says he must be retried.
¶ 38. But just because the identity of the person saying “guilty” is unknown to appellate counsel does not necessarily mean this person’s identity was not known by Jones’s trial counsel. Further, the record shows Jones’s trial lawyer had retained additional local counsel to help with voir dire. So Jones had two pairs of eyes and ears observing the venire during the State’s questions about the presumption of innocence. The record also shows Jones’s trial attorney scrutinized the venire, pushed for as many strikes for cause as possible, and used all of her peremptory strikes to get a fair jury. And the trial judge also was careful to err on the side of releasing any prospective juror that seemed like he or she was not up to the task. So the record shows vigilance, not carelessness, on the court’s and Jones’s counsel’s part to prevent any taint.
*1068 ¶ 39. Also, when the unidentified prospective juror answered “guilty,” the assistant district attorney quickly intervened. The prosecutor explained that the correct answer to the hypothetical was that no juror could find Jones guilty — but instead all were bound to find Jones not guilty— because no evidence had yet been presented. After giving an analogy of what it would look like for the State to overcome the presumption of innocence, the assistant district attorney asked the venire, “Do we understand each other now?” And the whole room of jurors answered “yes.” The prosecutor then followed up, “Will /all hear this case and base your decision solely on the evidence that you hear in this jury box?” And again, the entire pool said they would. So any potential misunderstanding about the presumption of innocence was immediately corrected.
¶ 40. What is more, when it was Jones’s counsel’s turn to poll the venire, she essentially asked the same question as the State — did anyone think Jones was guilty simply because he was here for trial? When no one responded, she asked again, telling them, “If you do, that’s okay. I just need to know.” But again no one responded, so she moved on to other questions.
¶ 41. Then, at the end of trial, the judge expressly instructed the empaneled jury on the presumption of innocence before it began deliberating. And “it is presumed that jurors follow the instructions of the court.” Pitchford v. State, 45 So.3d 216, 240 (¶ 96) (Miss.2010) (quoting Chase v. State, 645 So.2d 829, 853 (Miss.1994)). Thus, we find no presumption-of-innocence problem with Jones’s trial.

B. Jones and His Counsel Were Present During Empaneling

¶ 42. Jones cites Strickland v. State, 477 So.2d 1347, 1348-50 (Miss.1985), as “instructive” on why he should get a new trial based on voir dire. But the lesson from Strickland is based on inapposite circumstances. In Strickland, when the trial judge learned prospective jurors had been contacted by a relative of the defendant, the judge questioned the jurors in chambers, outside the presence of the defendant and his counsel. The supreme court deemed the judge’s questions as “tantamount to determining whether they were qualified to be empaneled.” Id. at 1349. And because the defendant had “an absolute right to be present during the empaneling of a jury,” excluding the defendant from the interrogation of jurors was reversible error. Id. (citations omitted). But the record here differs. It shows the potential jurors were questioned not only in Jones’s presence but also with his two attorneys — including one attorney who had been hired just to observe and advise about the venire. So the “injustice” that occurred in Strickland did not happen here.
¶ 43. Because the record, when considered fully, shows no violation of Jones’s right to a fair trial, Jones is not entitled to a new trial based on his claim the jury was potentially tainted.

Ill, Alleged Sleeping Juror

¶ 44. Jones also claims he is entitled to a new trial because the record shows one of the jurors was suspected of sleeping. According to Jones, the judge reversibly erred by failing to address this issue. But the record shows the judge did address the issue — and he did so to Jones’s apparent satisfaction.
¶ 45. At the end of the first day of trial, Jones’s counsel told the court that Juror 1 had been sleeping and “may need to [be] replace[d].” The judge, who had also observed Juror 1 earlier when he called for a coffee break, said he could address the *1069 matter then or in the morning. The State asked that they take up the issue in the morning, and Jones’s lawyer agreed. But the next morning, Jones’s counsel opted not to follow up and made no mention of Juror 1. Instead, it was the judge who brought up the issue that jurors “perhaps were sleeping.” The State asked the judge to wait until the end of trial before deciding whether to remove Juror 1. The judge agreed but told the bailiff to watch for inattentive jurors and vowed to keep the jury awake for the rest of trial.
¶ 46. That afternoon, the second day of trial, Jones’s counsel alerted the court that Jurors 1 and 7 looked like they were sleeping. The judge immediately granted her request to take a break and instructed Jurors 1 and 7 to get some coffee. On the third day of trial, there was a bench conference about two other jurors — Jurors 4 and 12 — who had scheduling conflicts that day. Because these jurors had not told the court of their conflicts during jury selection and because the alternates may have been needed to replace sleepy jurors, the court refused to release Jurors 4 and 12.
¶ 47. That was the last discussion about the jury. When both sides rested, the court asked if either, side had any matters that needed to be addressed. Jones’s counsel did not move the court to replace Juror 1, even though two alternates were still available. So the two alternates were released — without objection by Jones’s attorney — and Jurors 1-12 were sent to deliberate.
¶ 48. After the jury returned a “guilty” verdict, Jones moved for a new trial. But he did not see fit to base his post-trial motion on a claim that jury members had been asleep. Instead, for the first time on appeal, Jones suggests that Juror 1 should have been replaced with an alternate. As he now sees it, the trial judge’s failure to do so sua sponte entitles him to a new trial. As support, Jones cites Church v. Massey, 697 So.2d 407, 414 (Miss.1997), in which our supreme court expressed “great concern” over a sleeping juror. But Jones “goes too far in arguing his case is analogous to Church v. Massey, where a juror slept through ‘most of the proceedings.’ ” Birkhead v. State, 57 So.3d 1223, 1237 (¶47) (Miss.2011) (quoting Church, 697 So.2d at 413). Here, unlike Church, the record does not show Juror 1 slept through most of the trial. Rather, once the court was alerted that Juror 1 “perhaps” fell asleep during the first afternoon of trial, the court watched her and the rest of the panel closely for the rest of the trial to ensure no one dozed off. See id. at 1236-37 (¶¶ 46-47) (noting that, after the court was alerted a juror may have fallen asleep, the record indicated no further problems with that juror).
¶ 49. Church also has another key difference. In Church, plaintiffs counsel, after alerting the court during trial that a certain juror had been sleeping, made a motion at the end of trial to excuse the juror, which the judge denied. Church, 697 So.2d at 414. So on appeal the issue was teed up for the supreme court to decide whether the trial court abused its discretion by denying the plaintiffs motion — not whether the trial court had a sua sponte duty to remove.[7] Id.
¶ 50. Instead of being like Church, we find Jones’s case is analogous to Norris v. *1070 State, 490 So.2d 839, 845 (Miss.1986). There, the court raised its own concerns during trial that a juror may be sleeping. But it was only after the jury found the defendant guilty that defense counsel moved for a new trial based on the sleeping juror. The judge refused to grant the defendant’s post-trial motion because, as soon as the court had been alerted that a juror may have fallen asleep, the court had roused the jury and made them stand up and stretch. From that point, the court “constantly observed the jury,” so “if this juror was, in fact, asleep,” the court found “he could have only been asleep for a few brief moments” and, thus, could not have “missed very much of the testimony.” Id.
¶ 51. On appeal, not only did the supreme court find no abuse of discretion in the trial court’s decision, the court also found “there [had been] no timely complaint by counsel to the juror continuing to serve.” Id. at 846. The supreme court applied Gerlach v. State, 466 So.2d 75, 79 (Miss.1985), another case in which defense counsel did not complain about a member of the jury “until several days later, after the jury’s guilty verdict.” Norris, 490 So.2d at 846 (citing Gerlach, 466 So.2d at 79). In Gerlach, the supreme court found that, had defense counsel requested that the juror who had been tampered with be removed, “then [the juror] should have been taken off the jury and an alternate juror seated.” Gerlach, 466 So.2d at 79. But “[b]ecause the record fails to reflect a timely and adequate objection on the part of defense counsel,” the supreme court “den[ied] the assignment of error.” Id.
¶ 52. Like Norris and Gerlach, Jones did not move to have Juror 1 removed at the end of trial. Nor did he raise the issue in his motion for a new trial. Instead he waited until his appeal — which the supreme court has held is too late. See Birkhead, 57 So.3d at 1237(48) (defendant’s failure to raise the issue of a sleeping juror at trial or in a motion for new trial bars consideration on appeal).
¶ 53. Jones tries to get around Birk-head,’s procedural bar by arguing that, by merely voicing concerns the first day of trial that Juror 1 had been sleeping, his trial counsel had sufficiently “raised” the issue. But suggesting a juror “may” need to be removed does not equate with moving the court to actually remove the juror.
¶ 54. A motion would have resulted in the judge making an on-the-record decision. With a properly raised motion, the judge would have had to make a factual finding whether Juror 1 had been sleeping and, if so, for how long. The judge would have then had to exercise his discretion by either removing Juror 1 or justifying his keeping her on the jury. Cf. Norris, 490 So.2d at 845 (addressing trial court’s on-the-record findings regarding sleeping juror, made during motion for new trial). But because Jones made no motion, there are no on-the-record findings. Nor do we have the benefit of the court’s reasoning for keeping Juror 1 on the panel. All we have is the judge’s statement that Juror 1 “perhaps” had been sleeping on the first afternoon of trial, which is why he immediately roused her and told her to get coffee.
¶ 55. The decision to excuse jurors is within the trial judge’s discretion. Church, 697 So.2d at 414. And this court does not “lightly interfere” with such decisions. Reversal is proper only when we are “satisfied that the trial court has erred in holding a juror competent!.]” Id. Because Jones did not ask the judge to remove Juror 1, we have no decision to review for an abuse of discretion — let alone a basis in the record to interfere with that decision. We thus find Jones is not entitled to a new trial on this ground.
*1071 ¶ 56. THE JUDGMENT OF THE TU-NICA COUNTY CIRCUIT COURT OF CONVICTION OF SEXUAL BATTERY AND SENTENCE OF TWENTY-FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, TO BE SERVED CONSECUTIVELY TO ANY AND ALL SENTENCES PREVIOUSLY IMPOSED, AND TO REGISTER AS A SEX OFFENDER WITH THE MISSISSIPPI DEPARTMENT OF PUBLIC SAFETY, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P JJ., ISHEE, ROBERTS, CARLTON, FAIR AND JAMES, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.

. Renfro v. State, 118 So.3d 560, 564 (¶ 14) (Miss.2013) (citation omitted).

. Bush v. State, 895 So.2d 836, 844 (¶ 18) (Miss.2005) (citation omitted).

.Renfro, 118 So.3d at 564 (¶ 14) (quoting Dilworth v. State, 909 So.2d 731, 738 (¶ 33) (Miss.2005)).

. Bush, 895 So.2d at 844 (¶ 18).

. Bethany is a fictitious name, used to protect the identity of the sexual-assault victim, who was a minor at the time of the crime.

. Jones was represented by different counsel at trial.

. In Church, by the time the supreme court addressed the sleeping-juror issue, the court had already decided to reverse on other grounds. So while "concemfed]," the supreme court did not ultimately address the question whether the trial court had abused its discretion when it denied the plaintiffs motion to remove the juror. See Church, 697 So.2d at 414.