# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00462-COA

**BYRON ALLEN ELLISON**                                           **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                           **APPELLEE**

DATE OF JUDGMENT:            04/18/2022
TRIAL JUDGE:                HON. CHRISTOPHER LOUIS SCHMIDT
COURT FROM WHICH APPEALED:  HARRISON COUNTY CIRCUIT COURT,
                            FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:     OFFICE OF STATE PUBLIC DEFENDER
                            BY: ZAKIA BUTLER CHAMBERLAIN
ATTORNEY FOR APPELLEE:      OFFICE OF THE ATTORNEY GENERAL
                            BY: CASEY B. FARMER
DISTRICT ATTORNEY:          WILLIAM CROSBY PARKER
NATURE OF THE CASE:         CRIMINAL - FELONY
DISPOSITION:                AFFIRMED - 08/29/2023
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McCARTY AND EMFINGER, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.     A Harrison County Circuit Court jury convicted Byron Ellison of capital murder in connection with the death of his infant son, and the trial court sentenced Ellison to life imprisonment in the custody of the Mississippi Department of Corrections (MDOC) without eligibility for parole or early release. Ellison argues on appeal that he is entitled to a new trial because (1) the verdict was against the overwhelming weight of the evidence, and (2) the trial court erred by allowing a sleeping juror to continue to serve on the jury or, alternatively, that his defense counsel rendered ineffective assistance by not moving to have

the juror removed.[1]  We affirm the judgment, finding that the verdict is supported by the evidence and that Ellison waived his argument regarding the trial court's failure to remove the sleeping juror.  However, because the record is insufficient to address the merits of Ellison's alternative ineffective-assistance-of-counsel claim, we affirm the judgment without prejudice so that Ellison may seek permission from the Mississippi Supreme Court to file a motion for post-conviction collateral relief (PCR) should he wish to do so.

## FACTS AND PROCEDURAL HISTORY

¶2.　　Ellison and Jessica Smith began dating in 2017, and Smith became pregnant in January 2018.  Smith had a difficult pregnancy; so she and Ellison moved into his parents' home in Gulfport.  Smith's doctors diagnosed the unborn child with an esophageal issue that would require surgery upon birth.  On August 17, 2018, Smith gave birth to Colton Ellison by emergency cesarean section in a pre-term delivery.  Colton was transferred to the neonatal intensive care unit (NICU) at Oschner's Hospital in New Orleans, Louisiana, for surgery (a "TE  fistula repair") and recovery.  Smith and Ellison stayed in New Orleans while the baby recovered.  Colton was released from the hospital in mid-September, and the family moved back to the home of Ellison's parents.

¶3.　　During the next three weeks, Smith took Colton to pediatrician Dr. Prashant Dixit five times with various complaints, which included diarrhea, spitting up, and some blood in his

---

[1] Based on our analysis and disposition, we are addressing Ellison's issues in the opposite order raised in his brief.

mucus "in the back of his throat." Dr. Dixit found the child had no serious issues and was gaining weight and thriving. On October 13, 2018, Smith noted swelling around Colton's eyes. She sent a photo of his swollen eyes to her mother and Ellison's mother, but she did not consult a doctor. Later that night, she showered with the baby in an effort to open up his nasal passages. Afterward, Ellison's sister admonished Smith that it was dangerous to take the child into the shower.

¶4.     On October 15, Ellison stayed up late watching movies, and he went to sleep around 2:00 a.m. Colton was lying on a pillow between Ellison and Smith. At approximately 6:30 a.m., the baby woke up fussy; so Smith changed his diaper and went into the kitchen to prepare a bottle. A few minutes later, Ellison informed her that something was wrong with Colton. The baby had gone limp and was struggling to breathe. Smith took the child from him and told Ellison to call 911. The 911 dispatcher told Smith to start CPR, which she performed until the paramedics arrived.

¶5.     The paramedics found two-month-old Colton unresponsive with no pulse. One paramedic noted that Colton had two black eyes and some bruising on his arm. The paramedic managed to get Colton's heart beating, and the baby was taken to a nearby hospital where he was determined to be in critical condition. The treating physician noted the bruising around Colton's eyes. His pupils were also fixed and dilated, indicating "neurologic deterioration." The doctor determined Colton's injuries could not be accidental.

¶6.     Colton was transferred to Oschner's Hospital on life support. Pediatric neurosurgeon

3

Dr. Cuong Bui concluded that Colton had "fairly extensive, devastating, widespread injury to the brain" and that "surgical intervention" would not save his life. Colton was taken off life support on October 18, 2018.

¶7. Colton's death was investigated for abuse. Ellison waived his *Miranda* rights[2] and gave a recorded interview with Investigator Anthony Piazza. Ellison's story about what happened that morning changed three times. At first, Ellison stated he had been "bouncing Colton lightly on his knee." Then, he said that Colton's head may have "bounced . . . off his collar bone" while he was trying to soothe the child. Lastly, he suggested that Colton possibly fell off the bed.

¶8. On September 17, 2019, a Harrison County grand jury indicted Ellison for the capital murder of his son Colton, with child abuse and/or battery of a child as the underlying felony. *See* Miss. Code Ann. § 97-5-39(2) (Rev. 2014). A jury trial was held before the Harrison County Circuit Court on March 28-31, 2022.

¶9. Brett Taylor, a paramedic who responded to the 911 call, testified that he arrived at approximately 10:00 a.m. and discovered a firefighter giving an infant CPR. The only persons he observed in the room were Smith, the firefighter, and Colton. Initially, Colton was not breathing and did not have a pulse. Taylor also noted Colton had "racoon eyes" on both sides. Continuing CPR, Taylor moved the child to the ambulance and put him on ventilation. It was then that Taylor noted bruising on the child's right arm. He did not notice

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

any obstruction to Colton's airway. The ambulance took Colton to Garden Park Memorial Hospital. Smith and Ellison arrived at the hospital, and Taylor asked Ellison if the child had been injured. Ellison denied there had been any injuries or incidents (such as the baby's falling).

¶10. Smith testified that she and Ellison "[h]ad a positive and healthy relationship" at the beginning. Approximately six months into her pregnancy, she and Ellison moved into his parents' home. Neither she nor Ellison was employed at that time. She went into labor early and had a "C-section procedure." Colton had to be transferred to the NICU because he "had esophogram [sic] problem[s], . . . [and] [t]here was holes in his lungs."

¶11. According to Smith, she was the primary caregiver, "but [Ellison] helped some." She claimed Ellison would get "agitated" by Colton's crying and "would call him a little sh*t and ask [Smith] to get him to stop crying." Smith showered with Colton on one occasion, thinking that the steam would be good for his nasal passages. On the morning of October 15, 2018, Smith was preparing a bottle when Ellison brought the baby into the kitchen. Colton "could not hold his head up, his arms were like spaghetti arms, and he was struggling to breathe, and he was not crying." Smith asked Ellison to call 911. Ellison did not call right away but eventually did, and Smith began CPR under the 911 dispatcher's instruction.

¶12. Smith spoke to a Harrison County police officer at the hospital; then she went to her father's house in Long Beach and on to Oschner's Hospital with her father and stepmother. Smith attended the first "brain-death" examination of Colton. She felt "[a]ngry" and

5

[b]roken" and was "in denial." Smith did not attend the child's second brain-death examination because she "could not handle it." She admitted that she "was intoxicated [at that time] because [she] was depressed and grieving and my child was dying." Smith was angry at Ellison and had not spoken to Ellison since Colton's death. She admitted that she did not know what happened in the bedroom that day. When asked about showering with the child, Smith said Ellison's sister admonished her that it was dangerous to take the child into the shower. But she insisted that neither she nor Colton had fallen. When asked about the results of a CT scan at Garden Park Memorial Hospital, Smith recalled the doctor asked, "[D]id somebody drop this child, and they said that my child had a cracked skull."

¶13. Investigator Piazza testified that he was alerted to "a baby that was unresponsive." He learned upon arriving at the local hospital that the child "had sustained double brain bleeds." The investigator interviewed Ellison for several hours. Ellison told Investigator Piazza that he had been "bouncing Colton lightly on his knee" when the baby "began gasping for air." Ellison "tapped his feet, rubbed him a little bit," but Colton "just completely went unresponsive." The investigator said Ellison "later changed his story and stated that while bouncing Colton[,] . . . Colton's head may have bounced off his collar bone." Ellison's statement then changed "to Colton possibly fell off the bed." The audio and video recording of Ellison's statement was played for the jury.

¶14. Investigator Piazza did not observe any bruises or injuries on Ellison during the interview (in connection with Ellison's claiming the child's head bounced off his collarbone).

6

He also noted Colton had no bruising on his forehead. Defense counsel asked the investigator about his interview with Smith; he could not recall specific details of their conversation. Investigator Piazza admitted that he had referred "multiple times" during the interviews with Ellison and Smith to the child's having a skull fracture, which the investigator later discovered was not correct. Investigator Piazza explained that this misunderstanding was likely due to the "very chaotic scene that morning at the hospital." He also acknowledged that Ellison had said that he was sleep-deprived during the interview.

¶15. When questioned by defense counsel, Investigator Piazza explained that photos taken of the shower and surrounding area did not show anything capable of leaving a "linear" bruise on Colton's head, and "there were no indications that anything had occurred in the bathroom." Investigator Morgan Barry, who executed the search warrant at the house, also noted no blood, broken items, or glass in the room where the child had been. She attended Colton's autopsy and identified a photo of the back of the baby's head, which contained "a picture of a red linear abrasion." Investigator Barry alerted the medical examiner, Dr. Mark LeVaughn, to the apparent injury.

¶16. Dr. Dixit, Colton's pediatrician, was accepted as an expert in general pediatrics. He saw Colton on September 19, 2018, for a "well-child" visit. Dr. Dixit noted the baby was "growing" and "thriving." The following day, Smith took Colton to Dr. Dixit again, reporting the child was "spitting up, coughing and wheezing." Dr. Dixit said, "[T]he baby was doing good," and the diagnosis was simply "a concerned parent." The next day, Smith

brought Colton into the doctor's office for "watery bowel movements." Once again, Dr. Dixit found Colton was "doing fine" and noted "there was family anxiety." A week later, Smith brought Colton to Dr. Dixit because Colton "started crying and there was bleeding from the mouth." The doctor found nothing alarming or concerning and determined that the issue was likely related to the child's pacifier. On October 11, Dr. Dixit examined Colton for bleeding from the mouth. He noted that it was "bloody mucous from the nose that was going to the back of the mouth" caused by nasal congestion. Dr. Dixit reported that Colton grew over an inch and gained weight during the short period he treated him.

¶17. With regard to injuries, Dr. Dixit testified that babies' heads are "vulnerable" and soft and that the cardiorespiratory centers for the brain are located at the base of the brain near the brain stem. He agreed that if an infant suffered a trauma in that area, he would rapidly begin showing signs of neurological decline and distress. He further noted no sign that Colton suffered any problems from his surgery.

¶18. Dr. Simal Patel, who treated Colton at Garden Park Memorial Hospital, was accepted as an expert in the field of emergency medicine. He testified that Colton arrived at the hospital "via ambulance." Dr. Patel's initial examination showed that Colton was "very limp" and "[h]ad some bruising around the orbits." There was "no spontaneous heartbeat or breath sounds." Dr. Patel further noted that Colton's "pupils were fixed and dilated," indicating "some neurologic deterioration." Dr. Patel managed to regain a pulse and a spontaneous heartbeat, and he intubated the child, noting no obstruction of his airway.

¶19. Dr. Bui was Colton's attending pediatric neurosurgeon after Colton was transferred to Oschner's Hospital. When Colton arrived, Dr. Bui "unfortunately . . . wasn't able to elicit any real neurologic response," and he could "tell right away that whatever [was] going on, the baby had fairly extensive devastating widespread injury to the brain[.]" Dr. Bui noted Colton had "swelling and redness around both eyes" and "signs of external damage to the head, the skull, and the brain." Dr. Bui performed a brain-death examination to verify there was no chance of recovery. He stated that "there was a fair consensus among the team that this was a catastrophic, and more likely than not, non-accidental injury." Due to Colton's "devastating catastrophic neurologic brain injury," Dr. Bui was unable to surgically intervene to save Colton's life.

¶20. Dr. Bui further testified that, based on his evaluation and experience, "with medical certainty that this is most likely some sort of severe shaken baby" event due to "clear injury in the back of the head." He opined that "[i]t must of have been quite a bit of shaking or force involved in that effort to generate the injuries I'm seeing, along with the retinal hemorrhages, and enough that there is the extent of bruising in the eyes."

¶21. Dr. LeVaughn, the forensic pathologist who performed Colton's autopsy, testified that the "most significant finding on external exam was an abrasion on the back of the head" that had "kind of a linear pattern." He further reported, "The internal examination of the cranial cavity, the head, upon examination of the brain showed evidence of two types of hemorrhage, a subarachnoid hemorrhage and a subdural hemorrhage." Dr. LeVaughn opined that

9

Colton's cause of death "was blunt head injury" and that the manner of death was homicide. He did admit on cross-examination there was evidence of a past "healing injury" (a "yellow/brown discoloration") on the scalp.

¶22.    The State rested, and the defense moved for a directed verdict. The trial court overruled the motion, finding that "based upon [Ellison's] statement to law enforcement," there was "a sufficient jury question . . . as to whether Mr. Ellison is the one person responsible for the injuries and ultimate death of Colton Ellison."

¶23.    The defense presented testimony by deposition from Ellison's sister, Kimberly.[3] She stated that when the incident occurred, she was also living at her parents' home with her husband, Ellison, Smith, and Colton. Kimberly said that both Ellison and Smith had gone to parenting classes and "were definitely dedicated to being parents[.]" However, she did aver that "[t]wo nights before the incident," she observed Smith coming out of the bathroom with Colton in her arms and that Smith told her she and Colton had taken a shower. Kimberly told Smith "that was very alarming." She admitted that the baby was not crying at the time and was okay. Kimberly did note that during the two to three weeks that Colton was in the house, he was "[v]ery colicky." Ellison's parents testified that Smith and Ellison took care of the child and never noted any arguments or issues between the couple.

¶24.    Dr. Janice Ophoven was admitted as an expert in the field of forensic pathology. She

---

[3] Due to Kimberly's incarceration for a parole violation, she was unable to give in-person testimony.

10

reviewed Colton's autopsy, his medical records, and Dr. LeVaughn's autopsy report. Dr. Ophoven stated there is a difference in conducting an autopsy of an infant versus an adult. She said that Dr. LeVaughn's autopsy "read[] as an adult autopsy report" and noted "a number of oversights[.]" In particular, she pointed out there was "no description of the dissection of the esophagus," despite Colton's medical history and his prior esophageal surgery.

¶25. Dr. Ophoven disagreed with Dr. LeVaughn's conclusion that the abrasion on the back of Colton's head resulted from traumatic force, instead classifying it as a "superficial" scrape. She further noted that the postmortem report did not include "the presence of a significant preexisting damage to [Colton's] brain, and in multiple locations." Dr. Ophoven determined that on the day Colton collapsed, he "had excess fluid in his head"; so "any kind of alteration, theoretically, choking, a seizure, anything can tip the balance and go from okay pressure in the head to too high a pressure in the head." Dr. Ophoven concluded that "there is no evidence that [Colton] suffered a violent injury or abusive injury when he was brought to the hospital." Her opinion was that Colton suffered "a respiratory event" of unknown origin, which led to his cardiac arrest and eventually brain death. She summarized:

> I'm saying there is too many dead ends to tell you what the trigger for his collapse was at his house. He could have had fatal pneumonia and septicemia. He could have choked. He could have aspirated. He could have had a rebleed in his chronic subdural. He could have had a seizure that led to choking. There's too many possible mechanisms in an infant with this fragile of an airway to say exactly what happened. What I can say, in my opinion, that it was not abuse.

11

The defense rested.

¶26. The jury found Ellison guilty of capital murder, and the trial court sentenced him to life imprisonment in the custody of the MDOC without eligibility for parole or early release. On April 12, 2022, Ellison filed a motion requesting that the trial court "grant him a new trial and set aside the verdict." After a hearing, the trial court overruled Ellison's motion. Ellison now appeals the conviction.

## DISCUSSION

¶27. Ellison argues that the trial court erred in denying his motion for a new trial because (1) the verdict was against the overwhelming weight of the evidence, and (2) the trial judge failed to remove a juror who had been sleeping during the trial. As an appellate court, our role "is to review the trial court's decision to grant or deny a new trial for an abuse of discretion." *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017). Weighing "the evidence in the light most favorable to the verdict," we will "only disturb[] a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id*. (quoting *Lindsey v. State*, 212 So. 3d 44, 45 (¶14) (Miss. 2017)). We do not, however, "make independent resolutions of conflicting evidence, . . . [n]or do we reweigh the evidence or make witness-credibility determinations." *Id*.

    **I.    Whether the verdict was against the overwhelming weight of the evidence.**

¶28. Ellison claims that allowing his "conviction to stand would sanction an unconscionable injustice." He refers to Dr. Ophoven's testimony that Colton's death was not

12

a result of trauma but likely stemmed from his prior health issues. Alternatively, Ellison hints that Smith may have been responsible for Colton's death, citing Smith's failure to seek medical treatment for Colton's eye swelling and alleging it was "plausible" that Smith fell with the child while showering.

¶29. Dr. Ophoven testified there were deficiencies in Dr. LeVaughn's autopsy report. Her opinion—that Colton's death was not a result of trauma or abuse—differed greatly from the other physicians who testified. As the Mississippi Supreme Court has acknowledged, it should "come as no surprise" when "one party's expert witness contradicts the testimony of the other party's expert witness." *Clark v. State*, 315 So. 3d 987, 997 (¶23) (Miss. 2021). And it is the role of the jury to determine the "winner in a battle of the experts." *Id*. (quoting *Hill v. Mills*, 26 So. 3d 322, 330 (¶28) (Miss. 2010)).

¶30. We further find that the weight of the evidence does not support Ellison's allegation that Smith may have caused the infant's injuries. First, Smith denied falling. Additionally, when Dr. Bui was asked whether "a bathroom fall or a shower fall with a 200 pound weight coming down on [Colton]" could have resulted in the baby's neurologic injuries, the doctor responded, "[A]bsolutely not." Even his own expert witness, Dr. Ophoven, opined that Colton's death was a result of his medical issues, not blunt-force trauma. Lastly, during his interview with Investigator Piazza, Ellison changed his story three times as to what may have caused the child's brain injury. Accordingly, we find that Ellison has failed to demonstrate that the verdict was "contrary to the overwhelming weight of the evidence."

13

**II.     Whether the trial court erred by not removing a sleeping juror.**

¶31.    At the start of the third day of the trial, the State alerted the trial judge "that the juror that was sitting in the number two position basically slept through the entire day" with her head down and eyes closed "for a good 45,50 minutes at a time." Defense counsel said he was not aware of the sleeping juror and quipped, "I just need to watch and see when she's sleeping. If she is sleeping when [the State is] questioning, and awake when I'm questioning . . . ." The trial judge jokingly responded, "Then it's no problem." The trial judge said he would "keep an eye out" and address the issue if needed. When the jury was seated, the judge reminded jury members "to remain alert and pay attention to the testimony." No other mention was made regarding the sleeping juror after that reminder.

¶32.    Trial counsel's failure to move for a sleeping juror's removal "bars the defendant from raising the issue on appeal." *Horn v. State*, 273 So. 3d 758, 764 (¶17) (Miss. Ct. App. 2018) (citing *Bush v. State*, 222 So. 3d 326, 334-35 (¶¶30-31) (Miss. Ct. App. 2017)). In *Horn*, defense counsel remarked to the trial judge that two jurors had been asleep, but counsel did not raise any objection or make a motion for their removal. *Id*. at (¶15). We held that "'merely voicing concerns' over a sleeping juror was insufficient to preserve the issue for appeal; instead, an on-the-record motion to remove the juror was required." *Id*. at 765 (¶17) (citing *Jones v. State*, 149 So. 3d 1060, 1070 (¶53) (Miss. Ct. App. 2014)). Therefore, "the issue [wa]s waived." *Id*. at (¶19). Here, Ellison acknowledges that his trial attorney did not object to the sleeping juror or request the juror's removal. We therefore find that this issue

14

is waived on appeal. To the extent Ellison is arguing the trial judge's failure to remove a juror sua sponte entitled him to a new trial, this Court has rejected that argument. *See Jones*, 149 So. 3d at 1069 (¶48).

¶33. Ellison alternatively claims that defense counsel's failure to raise this issue at trial constituted ineffective assistance. A claim of ineffective assistance of counsel is often "'more appropriately brought during post-conviction proceedings' rather than on direct appeal." *Jones v. State*, 354 So. 3d 384, 395 (¶40) (Miss. Ct. App. 2023) (quoting *Nalls v. State*, 344 So. 3d 310, 317 (¶22) (Miss. Ct. App. 2022)). "We will reach the merits on an ineffective-assistance claim only in instances where (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." *Collins v. State*, 221 So. 3d 366, 372 (¶19) (Miss. Ct. App. 2016). In the present case, the State "does not agree that the record is adequate to address the issue and urges this Court to deny relief and preserve Ellison's right to raise the issue in PCR proceedings."

¶34. Ineffective-assistance-of-counsel claims will also be addressed on direct appeal "when the record affirmatively shows that the claims are without merit." *Jones*, 354 So. 3d at 395 (¶40) (quoting *Nalls*, 344 So. 3d at 317 (¶22)). "If the record is not sufficient to address the claims on direct appeal, the Court should dismiss the claims without prejudice, preserving the defendant's right to raise the claims later in a properly filed motion for post-conviction

15

relief." *Brown v. State*, 282 So. 3d 1192, 1200 (¶29) (Miss. Ct. App. 2019). We agree with the State that "there are too many unknowns for this Court to determine the issue on direct appeal." After the prosecution pointed out the sleeping juror, defense counsel did not make an objection or request that the juror be removed from the jury. A trial counsel's "choices of whether . . . to file certain motions . . . or make certain objections fall within the ambit of trial strategy." *Scruggs v. State*, 313 So. 3d 1084, 1092 (¶31) (Miss. Ct. App. 2021).

¶35. Because this issue involves our consideration of matters outside the content of the record, we dismiss Ellison's claim of ineffective assistance of counsel without prejudice to his right to seek permission from the supreme court to revisit the issue in a motion for post-conviction relief if he so chooses. *See id*. at (¶33). Because Ellison's other claims on appeal fail, we affirm his conviction and sentence.

¶36. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR. SMITH, J., NOT PARTICIPATING.**