## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

### NO. 2016-KA-00648-COA

JODY SLADE BUSH A/K/A JODY BUSH                    APPELLANT

v.

STATE OF MISSISSIPPI                               APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/07/2015 |
| TRIAL JUDGE: | HON. MARCUS D. GORDON |
| COURT FROM WHICH APPEALED: | SCOTT COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: W. DANIEL HINCHCLIFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | MARK SHELDON DUNCAN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF FELONY LEAVING THE SCENE OF AN ACCIDENT AND SENTENCED TO TWELVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH TWO YEARS SUSPENDED AND TWO YEARS OF POST-RELEASE SUPERVISION |
| DISPOSITION: | AFFIRMED - 06/06/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., FAIR AND WILSON, JJ.**

**WILSON, J., FOR THE COURT:**

¶1.     Jody Slade Bush was convicted of felony leaving the scene of an accident.  The

accident occurred when the truck Bush was driving left the road and flipped late at night in

Scott County.  Bush's roommate, Matthew Smith, was ejected from the truck and suffered

serious traumatic brain injuries.  Following a jury trial and guilty verdict, the circuit court

sentenced Bush to twelve years in the custody of the Mississippi Department of Corrections (MDOC), with two years suspended and two years of post-release supervision.

¶2. On appeal, Bush claims that he was deprived of a fair trial because of two comments by the trial judge and inadequate jury instructions. He also argues that he is entitled to a new trial because one juror was asleep at one point in the trial. Bush failed to raise these issues in the trial court, and his arguments are without merit. Therefore, we affirm his conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶3. On Saturday, August 2, 2014, Bush and Smith went to Thomas Heard's house for a cookout. Heard lived in a trailer on Old Highway 80 in Lake, Mississippi, with his sister, Alicia Parker. Heard and Bush were "best friends."

¶4. Bush drove to the cookout in his blue Ford F-150. On their way to the cookout, Bush and Smith stopped at a liquor store and bought some rum. There was some conflict in the testimony as to when Bush and Smith arrived at the cookout. Bush, Parker, and Jana Parks all testified that they arrived sometime between 8 and 9 p.m., whereas Ashley Manis testified that they arrived later.

¶5. Bush testified that he drank two cans of Keystone Light, a "mixed drink," and a shot of rum from the bottle while at the cookout. Bush testified that he also ate a steak, potatoes, and other food at the cookout, and he claimed that he was not intoxicated when he left the cookout. However, on cross-examination, Bush testified that he "didn't keep up with how

2

much [he] was drinking" at the cookout. Heard testified that he did not pay attention to how much alcohol Bush drank; however, he did not believe that Bush was intoxicated, and he had no hesitation about Bush driving. Parker similarly testified that she "didn't see [Bush] drink" and was not concerned about his ability to drive when he left.

¶6. Manis and Parks both recalled that Bush drank a "medium to heavy" amount of alcohol at the cookout. Manis testified that Bush drank tequila and took "several" drinks from a bottle of liquor. Parks also testified that Bush drank tequila straight from a bottle. Manis testified that she was "nervous" about Bush driving, especially when she saw him drive away from Heard's house "extremely fast" with his "tires spinning." Parks similarly testified that she did not think that Bush should have been driving that night and that she and "several" others urged him not to drive. Parks also testified that Bush "spun out of the driveway . . . driving fast."

¶7. Bush and Smith left the cookout around 11:30 p.m. to drive to Bush's parents' house. Bush was driving his truck. Bush testified that shortly after they left Heard's house, while driving on Old Highway 80, a tire on his truck blew out and he lost control of the vehicle. According to Bush, Smith grabbed for the steering wheel to try to control the truck, but the truck left the road, flipped, and came to rest on its side. Smith was ejected from the cab during the wreck. Bush remembered Smith being ejected through the back window of the cab, but the back window was still intact after the wreck. At trial, Bush claimed that he was driving 55 to 60 miles per hour when his tire blew out. The wreck occurred less than a mile

3

from Heard's house.

¶8. Bush testified that he "remember[ed] coming to" in the dark outside the truck, but he did not remember how he got out of the truck. Bush claimed that he yelled for Smith but could not find him. According to Bush, he also could not find his cell phone and did not know when another car might come down the road. Bush testified that he left the scene and walked back to Heard's house to get help.

¶9. Soon after the wreck occurred, Taylor Goodwin and her boyfriend, Caleb Shearer, came upon the scene while driving south on Old Highway 80. Goodwin noticed the truck's lights and then saw the truck in the ditch. Shearer testified that he saw a man climbing out of the truck as he and Goodwin passed by. When Goodwin and Shearer realized that the truck had wrecked, they stopped and turned around to go back and help. By the time they arrived back at the scene less than a minute later, the man that Shearer had seen climbing out of the truck was gone. However, they immediately saw Smith lying on the ground about thirty feet behind the truck. Goodwin testified that there was sufficient light from the wrecked truck for them to see Smith. When they found him, Smith was still alive, gasping for breath and choking on blood. Goodwin called 911.

¶10. About twenty or thirty minutes after Bush and Smith left, the group at Heard's house saw the lights and heard the sirens of emergency responders driving past on Old Highway 80. Parks and Parker left the house in a car to see what had occurred. Ten or twenty minutes later, Heard and Manis found Bush walking back up the driveway toward Heard's house.

4

Bush was "bleeding really bad" from a "big laceration" on his forehead. Heard testified that Bush's collarbone was swollen. Bush repeatedly stated, "Somebody please go find Matt. I'm sorry. I think Matt's dead." Manis helped take Bush inside the house and tried to wash off the blood and stop the bleeding.[1] Manis testified that Bush told her that he had been driving 80 to 85 miles per hour when he lost control of the truck, although Bush denied this and claimed that Manis misunderstood him.

¶11. Someone at the house called Parks and told her that Bush had returned. Parker and Parks then drove back to the house, and Parks, who is a nurse, cleaned Bush's laceration and bandaged it with Steri-strips and gauze. Parks encouraged Bush to go to the hospital, but he declined. Bush's parents came to check on him, but they later returned home, and Bush spent the night at Heard's house. Parks told others at the house to keep Bush awake because he could have suffered a concussion; however, Parks testified that this was only a precaution, and she did not believe that Bush was actually concussed. At trial, Dr. Steven Hayne testified for the defense that, based on his review of medical records, he believed that Bush suffered a concussion and a cracked vertebra.

¶12. Parker testified that Bush seemed to be "in shock" after he returned to Heard's house, and Heard testified that Bush seemed "shocked" and said things that did not make sense. However, Parks and Manis both testified that Bush was alert and aware of where he was and

---

[1] Manis testified that she had received training and had been certified as an emergency medical responder for a volunteer fire department.

what had occurred. Bush began smoking cigarettes soon after he returned to the house. Bush testified that he "just wanted to go smoke a cigarette to calm [his] nerves." Parks testified that she eventually asked Bush, "What the heck were you thinking? Why did you leave [Smith] there?" According to Parks, Bush answered, "I've been drinking. I'm not getting a DUI. I'm not going back to jail."[2]

¶13. Scott County Deputy Sheriff Coty May responded to the scene of the wreck. By the time May arrived, emergency medical personnel were already attending to Smith. May noticed that there was blood smeared on the inside of the truck's windshield and hand prints on the driver's side door, which led him to believe that a second person had been in the truck when it crashed. May testified that he heard one of two women near the road yell out that there had been a second person in the vehicle, that she was on the phone with him, and that he was "okay." May testified that at the time he was still assisting medical personnel with Smith, so he was unable to stop and question the women. By the time the ambulance left with Smith, the two women were gone, and May was unable to learn anything else about the truck's second occupant that night. Parks corroborated May's testimony. She testified that she "yelled . . . across the pasture" that "the driver [was] safe" but never talked to May or gave anyone the driver's name. Parker testified that she thought that she told May that Bush was the driver and that he was at Heard's house. However, May denied that Parker spoke to him, and there was nothing else to corroborate Parker's claim.

---

[2] Bush denied saying this.

¶14.    The next day—Sunday, August 3, 2014—May notified Smith's stepfather, Garry Wilson, that Smith had been in a wreck and was in critical condition at the University of Mississippi Medical Center (UMMC) in Jackson. Wilson testified that the doctors treating Smith initially did not expect him to survive.[3]  May met Wilson and gave him a cell phone that was found at the scene. Wilson did not believe that the phone looked like Smith's phone, and he also informed May that the wrecked truck did not belong to Smith. Wilson later looked through the contacts in the phone, and called "Dad," which turned out to be Bush's father, Lewis Bush (Lewis).

¶15.    On Tuesday, August 5, 2014, Bush and Lewis met Wilson at the trailer in Pearl where Bush and Smith had been living.[4]  Wilson testified that Bush first lied and claimed that Smith had borrowed his truck and that he (Bush) had not been in the truck when it wrecked. Wilson further testified that Bush then changed his story and admitted that he was in the truck but lied again and denied that he was driving at the time of the wreck. According to Wilson, Bush claimed that Smith had driven because he (Bush) had a suspended license from a prior DUI. Wilson testified that Bush finally admitted that he had been driving the truck at the

---

[3] Smith sustained numerous injuries in the crash, including traumatic brain injuries, and was airlifted to UMMC. He was in a coma initially, and he was unable to speak or feed, bathe, or otherwise care for himself for months after the crash. At trial, Smith's doctor testified that his memory and cognitive abilities had improved to some extent, but he was still physically disabled and required assistance with basic personal needs, and he was unlikely to recover to the point that he could drive or obtain employment. Wilson testified that Smith had no memory of the crash or the events leading up to it.

[4] Bush and Smith had been roommates for only a short time. This was the first time Wilson had met Bush.

time of the wreck.[5]

¶16.    Wilson called May that evening and told him about his conversation with Bush.  May did not know that Bush had been in the truck or driving before Wilson told him.  A few days later, May went to Heard's house, where Bush was still staying.  Bush went to the sheriff's department with May and gave a statement.  A Scott County grand jury indicted Bush for felony leaving the scene of an accident.  *See* Miss. Code Ann. §§ 63-3-401 & -405 (Rev. 2013).  The case proceeded to trial on October 5-7, 2015.

¶17.    Testifying in his own defense, Bush stated that after the wreck, he was unable to find Smith or a cell phone.  He claimed that he was in great pain and "was seeing lights and rainbows."  He claimed that he left the scene because he did not know if any other cars would drive past, and Heard's house was "the only place [he] knew" to go.  He testified that he returned to Heard's house to find help for Smith.  Bush denied that he was intoxicated; as noted above, he testified that he only had two beers, a mixed drink, and a shot of rum, although he also testified that he "didn't keep up with how much [he] was drinking."  Bush testified that he went to the emergency room on Monday, August 4, 2014, because the pain in his shoulder worsened.  He then returned to Heard's house for a few more days until sheriff's deputies came to talk to him.  Bush claimed that he did not contact law enforcement because he assumed that they knew that he was the driver and would seek him out.

---

[5] Lewis and Bush testified that Bush never denied that he was in the truck or driving the truck at the time of the wreck.

8

¶18. May testified at trial that there was an inhabited residence near the wreck that Bush would have passed by directly on his way back to Heard's house. May also testified that there were five other inhabited residences on the opposite side of the road between the scene of the wreck and Heard's house. All of these homes were closer to the scene than Heard's house.

¶19. At the close of the evidence, the jury found Bush guilty of felony leaving the scene of an accident. The circuit court sentenced Bush to twelve years in MDOC custody, with two years suspended and two years of post-release supervision.

¶20. Bush's trial counsel failed to file any post-trial motions and failed to file a notice of appeal. Trial counsel filed a "Petition for Appeal In Forma Pauperis," but even that pleading, which was not a notice of appeal, was filed more than thirty days after the circuit court entered its final judgment of conviction and sentence. The Clerk of the Supreme Court issued a notice to trial counsel to show cause why the appeal should not be dismissed as untimely. Trial counsel failed to respond to the show-cause notice; however, the Office of the State Public Defender (OSPD) did respond. OSPD acknowledged that trial counsel failed to perfect the appeal and requested leave to file an out-of-time appeal. The Supreme Court entered an order granting leave to file an out-of-time appeal. *See* M.R.A.P. 4 cmt.

¶21. As noted above, Bush raises two issues on appeal. First, he claims that he was prejudiced due to two comments by the trial judge—one during voir dire and one during the trial—and allegedly inadequate jury instructions. Second, he argues that he is entitled to a

new trial because a juror was asleep at one point in the trial. We address these issues below.

## DISCUSSION

### I.       Jury Instructions and Judicial Comments

¶22.    Bush phrases his first issue on appeal as "whether the jury instructions, including judicial comments, fairly announced the law and properly instructed the jury so as to assure the jury reached a just and fair verdict." We start with the two "judicial comments" about which Bush complains and then move on to alleged deficiencies in the jury instructions. We begin by noting that Bush did not object to either of the judge's comments. Therefore, the issue is waived for purposes of appeal.[6] Procedural bar notwithstanding, these arguments are also without merit.

¶23.    Near the beginning of voir dire by the court, the transcript shows that the trial judge asked potential jurors the following question: "Can you give him the burden of the proof preponderance [sic]?"[7] At the time, Bush did not object or ask the judge for clarification, but he now argues that "[t]he jury was then and there mis-instructed to a much lower burden of proof and . . . asked by the trial judge if they would commit to that lessened burden of proof." Assuming the transcript accurately reflects the judge's comment, the contention that it amounts to prejudicial error is without merit. The judge had *just finished* accurately

---

[6] *See, e.g.*, *Moody v. State*, 841 So. 2d 1067, 1075 (¶15) (Miss. 2003); *Shelton v. State*, 445 So. 2d 844, 846 (Miss. 1984); *Hollins v. State*, 99 So. 3d 237, 240 (¶8) (Miss. Ct. App. 2012); *Shephard v. State*, 66 So. 3d 687, 691 (¶13) (Miss. Ct. App. 2011).

[7] "Sic" is indicated in the official transcript.

instructing the potential jurors on the defendant's "presumption of innocence" and the State's burden to "prove this charge beyond a reasonable doubt." The judge went on to state that he would give the jury instructions on the law, which the jury would be required to follow. At the close of the evidence, the judge again instructed the jury on the presumption of innocence and the requirement of proof beyond a reasonable doubt. "It is presumed that the jury follows the judge's instructions." *Moody*, 841 So. 2d at 1076 (¶18). We presume that the jurors in this case followed the clear instructions given to them at the close of the evidence, not an unclear and un-objected-to comment two days earlier during voir dire. *See id.* at (¶19).

¶24. Bush also insists that, during cross-examination of his girlfriend, Mitra Ghafarianpoor, "the trial judge made two statements which could only be viewed as comments on the evidence which were peremptory in nature and instruct[ed] the jury to find certain elements as facts." In support of this claim, Bush points to the following exchange, which occurred when the prosecutor was questioning Ghafarianpoor about whether she had received a voice mail from Bush's sister in the hours after the wreck:

> THE COURT: Just a minute. You know the issues in this case is whether this fellow here was driving that pickup and - -
>
> MR. MCMURTRY: No, sir. No, that's not an issue.
>
> THE COURT: Well, he was driving the truck.
>
> MR: MCMURTRY: Well, that's one of the elements - -
>
> THE COURT: And he left the scene. Now that's the issue. Now, I want you

11

to get to it instead of . . . .

Bush asserts that these statements by the judge amounted to "two de facto peremptory instructions." Again, however, Bush did not object to the judge's comments, so the issue is waived.

¶25. Moreover, the trial judge was only instructing the prosecutor to limit his questions to the material factual issues in the case. The prosecutor argued that Ghafarianpoor had made inconsistent statements about the voice mail, which went to her "credibility," but the judge ruled that "there [was] no credibility issue at all," and that the matter of the voice mail was "irrelevant." The trial judge then instructed the prosecutor to "get on with this case."

¶26. In context, the judge's comments cannot be interpreted as peremptory instructions or prejudicial to Bush. The evidence at trial, including Bush's own testimony, was undisputed that Bush was driving and that he did leave the scene. At the close of the evidence, the court fully and fairly instructed the jury on Bush's theory of defense, including instructing that a person is not guilty of felony leaving the scene of an accident if he "left the scene to find help or aid for himself or another." The trial judge's brief reference to two obvious and undisputed facts—in the course of a ruling limiting the State's cross-examination of a defense witness—was not an improper comment on Bush's theory of the defense. Bush was able to present his defense with proper instructions and without any improper limitation. Bush's complaint about the trial judge's comment is without merit.

¶27. Finally, Bush complains that the trial judge did not give two "standard instructions,"

12

one that provides general instructions for juries in criminal cases and one on the requirement of a unanimous verdict. *See* Mississippi Judicial College, *Mississippi Model Jury Instructions*, *Criminal* § 1:2 & 1:23 (2016). Bush argues that these standard instructions were needed to reduce confusion created by the trial judge's comments. However, we have already determined above that the trial judge's comments were not improper or prejudicial, and the jury was fairly and accurately instructed on the presumption of innocence and the State's burden of proof. Moreover, Bush did not request either of these instructions at trial or object when they were not given. Indeed, neither instruction was mentioned during the charge conference or at any other point. Accordingly, this issue is procedurally barred[8] and without merit.

## II. Sleeping Juror

¶28. Bush argues on appeal that he is entitled to a new trial because a juror was allowed to remain on the jury after he was observed sleeping during a witness's testimony.[9] During Wilson's cross-examination, Bush's attorney (Mr. Camp) noticed that a juror was asleep. He asked for permission to approach the bench and the following sidebar occurred:

MR. CAMP: I think we have a juror that's asleep.

---

[8] *See, e.g.*, *Wilson v. State*, 956 So. 2d 357, 363 (¶14) (Miss. 2006) ("A trial court is not required to sua sponte instruct the jury or suggest jury instructions in addition to what the parties tender. . . . [I]t is not error when a trial court does not [give an] . . . instruction [that] was not presented by either party.").

[9] We review a trial judge's decision excusing or declining to excuse a juror for abuse of discretion only. *Jones v. State*, 149 So. 3d 1060, 1070 (¶55) (Miss. Ct. App. 2014).

MR. MCMURTRY: I disagree, Judge. I think he might be sleepy, but he's not asleep.

MR. CAMP: Well, he was snoring a second ago. . . .

THE COURT: Which one is asleep?

MR. CAMP: I think the gentleman in the yellow. He may have woken up now. I don't know.

THE COURT: I think he was asleep this morning.

MR. CAMP: I don't know.

THE COURT: I'll wake him up.

MR. CAMP: Okay.

THE COURT: The juror is asleep. Have a seat.

The trial judge instructed the juror: "You're going to have to stay awake or send the bill to this baldheaded fellow over here." What exactly the judge meant is not clear from context. But in any event, there was no further discussion of the juror, and Bush never requested that the juror be replaced with an alternate.

¶29. Bush notes that "[t]he Mississippi Supreme Court has stated that a sleeping juror is a matter of 'great concern' to the courts." *Carpenter v. State*, 132 So. 3d 1053, 1059 (¶17) (Miss. Ct. App. 2013) (citing *Church v. Massey*, 697 So. 2d 407, 414 (Miss. 1997)). That is true, but it is also well-settled that a trial judge will not be put in error on an issue that was never presented to the judge for a decision. Thus, if the defendant never asks a trial judge to remove the sleeping juror during trial, he is procedurally barred from raising the issue on

appeal. *See Birkhead v. State*, 57 So. 3d 1223, 1236-37 (¶¶46-48) (Miss. 2011); *Jones*, 149 So. 3d at 1068-70 (¶¶44-55).  As a general matter, a sleeping juror is of great concern to this Court and the Supreme Court; however, based on Bush's failure to request removal of the juror at any point during the trial, we can only assume that *this particular* sleeping juror was of no great concern to Bush or his counsel.

¶30.    This case is similar to *Jones*.  There, both the defendant's attorney and the trial judge noticed one or two jurors sleeping more than once during the trial, and the defendant's attorney suggested that one of the jurors might need to be replaced.  However, the trial judge reserved ruling on the issue, stating that he would wait until the end of the trial to determine whether removal was necessary.  *See id.* at 1068-69 (¶¶44-47).  The defendant never made a motion to remove the sleeping juror, and this Court held that his failure to do so barred him from raising the issue on appeal.  *See id.* at 1069-70 (¶¶47-55).  The Court rejected the defendant's argument that "the trial judge's failure to [remove a juror] sua sponte entitle[d] him to a new trial." *Id.* at 1069 (¶48).  We explained that "merely voicing concerns" about a sleeping juror was insufficient to preserve the issue for appeal; rather, an on-the-record motion to remove the juror was required.  *Id.* at 1070 (¶53).  Because the defendant failed to make such a motion, there were "no on-the-record findings" on the issue, nor did "we have the benefit of the [trial] court's reasoning for keeping [the juror] on the panel." *Id.* at (¶54).  Therefore, there was "no decision to review for an abuse of discretion." *Id.* at (¶55).  We held that the defendant had waived the issue and was not entitled to a new trial.  *Id.*

15

¶31. The result is the same in this case. Bush did not ask that the juror be removed, so we can only assume that he did not object to this juror remaining on the panel. Furthermore, because Bush did not make a motion to remove the juror, there are no findings as to how long the juror was asleep, nor do we know the trial judge's reasoning for allowing the juror to remain on the panel. On this record, Bush is not entitled to a new trial simply because the trial judge did not remove the juror sua sponte. Rather, Bush waived the issue by failing to request that relief in the trial court.

## CONCLUSION

¶32. The issues raised by Bush on appeal are procedurally barred and without merit. Therefore, his conviction and sentence are affirmed.

¶33. **THE JUDGMENT OF THE SCOTT COUNTY CIRCUIT COURT OF CONVICTION OF FELONY LEAVING THE SCENE OF AN ACCIDENT AND SENTENCE OF TWELVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH TWO YEARS SUSPENDED AND TWO YEARS OF POST-RELEASE SUPERVISION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO SCOTT COUNTY.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, FAIR, GREENLEE AND WESTBROOKS, JJ., CONCUR.**