# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-01223-COA

**JEFFREY PEYTON HORN A/K/A JEFFERY HORN A/K/A JEFFERY P. HORN A/K/A JEP HORN**                                           **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                           **APPELLEE**

DATE OF JUDGMENT:                05/22/2017
TRIAL JUDGE:                     HON. JOHN KELLY LUTHER
COURT FROM WHICH APPEALED:       CHICKASAW COUNTY CIRCUIT COURT,
                                 FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:          EDWARD D. LANCASTER
ATTORNEY FOR APPELLEE:           OFFICE OF THE ATTORNEY GENERAL
                                 BY: ABBIE EASON KOONCE
DISTRICT ATTORNEY:               BENJAMIN F. CREEKMORE
NATURE OF THE CASE:              CRIMINAL - FELONY
DISPOSITION:                     AFFIRMED - 11/27/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE LEE, C.J., BARNES AND WESTBROOKS, JJ.**

**BARNES, J., FOR THE COURT:**

¶1.    A Chickasaw County jury convicted Jeffrey Horn of aggravated assault with a deadly weapon; specifically, shooting his girlfriend in the thigh during a domestic altercation. The trial-court judge sentenced Horn to serve twenty years in the custody of the Mississippi Department of Corrections, with eight years suspended, twelve years to serve, and five years of postrelease supervision. He was also ordered to pay court costs, medical expenses, and restitution.

¶2.    Horn appeals, arguing the trial court erred in not removing a "sleeping juror" from the jury panel and in granting a pre-arming jury instruction. Horn also argues a judgment notwithstanding the verdict (JNOV) or, alternatively, a new trial, should have been granted due to a juror's relationship with the victim. Finally, Horn argues cumulative error warrants reversal. We find no merit to Horn's arguments and affirm his conviction and sentence.

**FACTS**

¶3.    The shooting in this case stems from a relationship Horn had with the victim, Regenia Higginbotham. They began seeing each other in September 2014. Horn maintains their relationship was turbulent and mainly sexual, while Regenia claims they did not argue much and that she "truly loved" him. It was undisputed, however, that Regenia was frustrated because she wanted a more committed relationship than Horn was willing to offer and that Horn had a drinking problem.

¶4.    Regenia claims their first physical altercation occurred at Horn's home in Houston, Mississippi, in November 2014, approximately four months before the instant assault. Horn claimed Regenia knew he was seeing other women, but she was in "constant contact" with him by telephone, text, or visits. Regenia had not seen Horn in a few days and decided to drive to his house and "check on him" unannounced. When Regenia knocked on the window of the utility-room door, Horn was inside entertaining a woman named Chelsea. Horn answered the door but was reluctant to let Regenia in. A scuffle ensued as Regenia attempted to come inside the house. According to Regenia, Horn grabbed her by the hair

2

and placed her in a "choke-hold"; so, she took a broken window-pane glass shard and stabbed him in the ankle. According to Horn, Regenia went running through the house in an "absolute rage" screaming "where is she at, Jep?" Bleeding profusely, Horn walked through the house yelling at Regenia. He retrieved a nine-millimeter gun that was kept hidden under the mattress in his bedroom. Regenia—a nurse—satisfied no other woman was at Horn's house,[1] calmed down and began tending to Horn's wound. Regenia began cleaning the blood from the floors with peroxide. Horn, angry, called 911. Horn told her she could leave before law enforcement arrived, but she declined. Law enforcement arrived and, unbeknownst to Horn, saw him holding a gun over Regenia's head while she cleaned the floor. Regenia was arrested for simple assault, but Horn later dropped the charges because Regenia would lose her nursing license. He claims Regenia called him four days later wanting to reconcile, but he adamantly declined.

¶5.    However, in early 2015, the couple began communicating with each other again. By February, Horn stated they were having sex in his used-car business office, located in front of his house, several times a week during the lunch hour. On March 12, 2015, the sex- and alcohol-filled weekend that led to the instant assault began when, according to Regenia, Horn called and told her "to get her butt over [to his house]." Regenia complied. Both claimed to enjoy riding around the back roads of the area "looking at nature and stuff." Regenia would drive while Horn would drink. On this day, they took a long drive. Horn

---

[1] Chelsea was hiding in a closet, unbeknownst to Regenia.

was drinking, but they were not arguing. According to Horn, they "had a lot of sex" that evening.

¶6.     Horn testified the next day Regenia began "hammer[ing]" him "constantly" about a more exclusive relationship. They had "more sex" and drove around. Horn was drinking heavily. That afternoon, they ended up at "The Pony," a strip club in West Point, Mississippi.[2] Regenia became irritated because Horn was frequently going to "the back" to enjoy lap dances. Later in the evening, Horn was removed from the strip club for slapping a dancer's buttocks during a lap dance. On the drive home, Horn testified that Regenia, apparently jealous from the lap dances, "just out of the blue . . . tore me up" with her fingernails while she was driving. Regenia testified that Horn was the one who was angry—he was yelling and hitting the dash of the car while hitting and biting her right arm. Regenia admitted grabbing his face to make him quit hitting her. Photographs of Regenia's heavily bruised right arm and Horn's scratched face were entered into evidence. They returned to his home and calmed down. Later, Horn admitted to Regenia he did not remember hitting her arm in the car when she showed him her bruised arm.

¶7.     On the morning of March 14, 2015, they woke up, had sex, and drove around back roads again until 8:00 p.m. According to Regenia, that day Horn consumed two pints of vodka, one-half of a case of beer, and approximately four Lime-a-ritas. According to Horn,

---

[2] Horn claimed Regenia "loved" to go there; Regenia stated she felt "uncomfortable being there."

Regenia had been "hammering" him more about "being together." Regenia testified that during a stop at the Dollar General store, Horn became paranoid that people were "coming after" him. Embarrassed, Regenia "fussed" at Horn about the incident. Horn became angry and told Regenia he was going to "whoop her butt" when they got home. Later, Horn admitted he did not remember going to the Dollar General store.

¶8. Upon arriving at Horn's house, Regenia said Horn suddenly pulled a gun on her from behind his back and pointed it at her. Initially, she headed toward the bathroom thinking she could escape from him there, but she realized he could shoot the door open and she would be trapped. Remembering there was a gun underneath the mattress in Horn's bedroom, she ran there instead. Regenia was uncertain if Horn was following her, but as she lifted the mattress she heard him at the doorway to the bedroom. The next thing Regenia knew she was shot in the thigh, and fell to the ground.

¶9. Horn's version of the shooting differed. Regenia was angry about the state of their relationship when they returned home. Horn was drinking a beer and smoking a cigarette in the utility room when Regenia entered, talking about "the same thing"—a more serious relationship. He told her "that's not what I want." Horn testified: "She quits talking. I see her. She opens the door. She walks into it, walks into the house, shuts the door like normal, and she takes off running." Describing her demeanor, Horn testified, "She's getting mad. . . . She actually puffs up . . . but when she took off running, I knew where she was going . . . to get that gun." He continued:

5

When I see her take off running, I get up; and I get my pistol; and I go into the house; and as I'm going into the house, I can see she made it through the dining area; and I see her turn down the hall. I follow her . . . I'm walking down the hall fast; but as I get to where you can actually see into the bedroom, probably . . . 6 or 7 feet before you actually get to the door frame, I mean she's right there. She's getting the gun. As I walk up to the door, she's got her back to me. She turns around, and she's pointing it directly at my head. I try to take cover. . . . I put mine on her. She's got the craziest look. . . . When I see those eyes, I actually lunge; and I shoot her. . . . I shoot her right in the middle.

He later testified "I popped her" because "she [was] fixing to kill me."

¶10. The bullet actually struck Regenia's left thigh. She collapsed in pain, dropping the pistol. Horn picked it up and put both guns on top of the washing machine in the utility room. Horn claimed he called 911 within seconds; Regenia claimed it was more like fifteen to thirty minutes. A recording of the 911 call, placed at 9:40 p.m. on March 14, 2015, was played for the jury and entered into evidence. Horn admitted a "woman's been shot," but was reluctant to give his name. He also exclaimed to Regenia "Do you not fu--ing see what you're doing to me?" He told the ambulance dispatcher that he had shot Regenia "in the gut." When asked if it was an accident he replied, "Well, I mean I wouldn't say that." Due to the bullet wound, Regenia's leg bone was shattered, and required two surgeries to insert a plate, rod, seven screws, and a wire into her thigh.

¶11. Horn was arrested and, once sober two days later, was interviewed by law enforcement. Horn admitted he meant to shoot Regenia in the leg to stop her, not her "gut." Horn maintained, however, that Regenia was "fixing to kill" him with the loaded nine-millimeter gun.

6

## DISCUSSION

### I.       Alleged Sleeping Juror

¶12.    Horn claims reversible error occurred when an alleged sleeping juror (number 23) was not removed from the jury panel. Horn argues the trial court's "denial" prejudiced him, depriving him of a fair trial and due process. We find, however, that Horn's counsel never objected or requested the alleged sleeping juror be removed; the only "denial" by the trial court related to Juror 23 was a challenge for cause.

¶13.    Concern with Juror 23 began during voir dire, when the trial judge asked if anyone had worked the night before. Juror 23 responded affirmatively, stating she had worked from "6:30 to 3:30" and was usually asleep at this time of day. However, because she had not asked to be excused and she was not working that night, the trial judge let her choose if she wanted to remain in the jury pool or leave. She responded that she wanted to stay. When the prosecutor asked if jury duty would cause a problem with her work schedule tomorrow and the next day, she responded "I can do it."

¶14.    After voir dire, during challenges for cause, Horn's counsel requested striking Juror 23, but the trial court denied his request.

> BY [DEFENSE COUNSEL]: Judge, the only one we wanted to strike was number 23. It was the reason she stated that she had been up all night. She literally fell asleep out there a couple of times. I think for cause she couldn't sit here and actually hear the case the rest of the day. She was falling asleep during voir dire.
>
> BY [THE PROSECUTOR]: I specifically asked her the next day and the next. She said she wants to stay.

7

BY THE COURT: I didn't notice her.  Ms. Clerk?

BY THE CLERK: I didn't notice.

BY THE COURT: I am going to let her stay.  *That will be one you can use a challenge on if you would like to.*  She seemed awfully alert when I was talking to her anyway.

(Emphasis added).  Later, when peremptory strikes were to be made, Horn's counsel did not move to strike Juror 23, even though he had only exercised two previous peremptory strikes.

BY THE COURT: That brings to the defense Juror 23. . . .

BY [DEFENSE COUNSEL]: We're at 9 [jurors accepted].

BY THE COURT: You've got 10.

BY [DEFENSE COUNSEL]: I'm sorry.  We would *tender* [Juror 23].

(Emphasis added).  Defense counsel then exercised a third peremptory strike on the next juror.

¶15.   During the first day of trial at 3:30 p.m., after three witnesses for the State had testified—the 911 operator and two county sheriff department officers who first arrived at the scene—defense counsel, outside of the presence of the jury, expressed concern about two jurors: "Your Honor, they[3] are telling me that 20 and 23 have literally slept through the entire part of that testimony, and they tell [me] that when [the prosecutor] hit the microphone, one of them jumped up like she had been shot."  There was more concern over

---

[3] It is unclear from the record who "they" is, but apparently counsel did not have first hand knowledge of the jurors' sleeping.

8

Juror 20 than 23. The trial judge stated he had been observing Juror 20 but not Juror 23. He proceeded to give a detailed on-the-record description of Juror 20's behavior. He was not willing to call Juror 20 a sleeping juror yet, but he would continue to monitor her, and if it became appropriate to remove her, he would. As for Juror 23, the judge only stated he would try to pay more attention to her. The State concurred with defense counsel's descriptions of the two jurors but did not request their removal. The trial judge stated: "Regardless of whether I elect to move them into an alternate position, I'm not going to remove them from the jury panel." Defense counsel then asked if they could reconvene the next day because equipment had to be set up, as well as "due to the concern of the jurors." The trial judge agreed, and the court recessed for the day. No motion for removal or further mention was made of either juror being inattentive. Horn raised the issue in his motion for a JNOV or a new trial, which was denied. In the motion, Horn claimed that he "objected" to the alleged sleeping juror, but there is no such objection in the transcript. Counsel only made a challenge for cause that was denied.

¶16.   The Mississippi Supreme Court has stated that a sleeping juror is a matter of "great concern" to the courts. *Church v. Massey*, 697 So. 2d 407, 414 (Miss. 1997). "It is well founded that the trial judge has the discretion to excuse potential jurors for cause if the court believes the juror could not try the case impartially." *Id.* (quoting *Burt v. State*, 493 So. 2d 1325, 1327 (Miss.1986)). Further, "[t]his Court will not lightly interfere with a finding of fact made by the trial judge in a criminal case, and it will reverse only when it is satisfied

9

that the trial court has erred in holding a juror competent . . . ." *Id.* (quoting *Woodward v. State*, 533 So. 2d 418, 424 (Miss. 1988)).

¶17. Horn's counsel did not make a motion to remove Juror 23, either during or at the end of trial. This Court has held that failure to make a motion for removal bars the defendant from raising the issue on appeal. *Bush v. State*, 222 So. 3d 326, 334-35 (¶¶30-31) (Miss. Ct. App. 2017) (citing *Jones v. State*, 149 So. 3d 1060, 1070 (¶55) (Miss. Ct. App. 2014)). In *Jones* and *Bush*, similar situations occurred. In *Jones*, both defense counsel and the trial judge noticed one or two jurors sleeping more than once during the trial, and defense counsel suggested one of the jurors "may need to be replaced." *Jones*, 149 So. 3d at 1068 (¶45). The trial court reserved ruling on the issue until the end of trial. *Id.* This Court stated the record did not show the juror slept through trial, but "perhaps" fell asleep during one afternoon; however, the trial judge watched her and the rest of the jury closely, and there were no further problems. This Court rejected the defendant's argument on appeal that the trial judge's failure to remove a juror "sua sponte" entitled him to a new trial. *Id.* at 1069 (¶48). This Court explained that "merely voicing concerns" over a sleeping juror was insufficient to preserve the issue for appeal; instead, an on-the-record motion to remove the juror was required. *Id.* at 1070 (¶53).

¶18. Likewise, in *Bush*, defense counsel did not request a sleeping juror be removed and replaced with an alternate. Even so, on appeal the defendant argued he was entitled to a new trial. *Bush*, 222 So. 3d at 334 (¶28). This Court found the defendant waived the issue by

10

failing to request relief from the trial court. *Id.* at 334-35 (¶31).

¶19. Here, the facts are similar, and the result is the same. Since Horn failed to request Juror 23's removal, the issue is waived. Notwithstanding the waiver, the record does not indicate that Juror 23 had any further problems staying awake. The record only suggests that the juror "might" have been sleeping during "part" of one officer's testimony. There is no evidence that Juror 23 was incompetent or that Horn suffered any prejudice.

¶20. Further, if we analyze Horn's argument, as the State suggests, as a denial of a challenge for cause or waiver of a peremptory strike, the issue is also without merit.

¶21. Our Court reviews challenges for cause by the following standard:

> Generally, a juror removed on a challenge for cause is one against whom a cause for challenge exists that would likely affect his competency or his impartiality at trial. But, the selection of jurors is a judgment call peculiarly within the province of the circuit judge, and one we will not on appeal second guess in the absence of a record showing a clear abuse of discretion. The trial court is entitled to deference when its for cause strikes are reviewed because of its ability to evaluate the demeanor of potential jurors . . . .

*Lomax v. State*, 220 So. 3d 211, 213 (¶3) (Miss. Ct. App. 2017) (citations and internal quotation marks omitted). Additionally, "before a claim related to a denial of a challenge for cause may be valid, (1) the defendant must have exhausted all of his peremptory challenges and (2) an incompetent juror must be forced by the trial court's erroneous ruling to sit on the jury." *Id.* at (¶7) (quoting *Burgess v. State*, 178 So. 3d 1266, 1276 (¶28) (Miss. 2015)).

¶22. The trial court did not abuse its discretion in refusing to strike Juror 23 for cause.

When questioned by the trial judge, the juror stated she would not work that night and could serve. The fact she worked the night before did not affect her competency—witnesses' testimony started the next day. Further, the trial judge told Horn's counsel he could use one of his peremptory challenges to strike her if desired, but he did not. Because Horn had not exhausted all of his peremptory challenges when presented with Juror 23, we cannot find the trial court abused its discretion in allowing Juror 23 to sit on the jury.

## II.     Jury Instruction S-3

¶23.    Horn argues that the granting of jury instruction S-3, a pre-arming instruction, over the defense's objection, was error because it deprived him of claiming self-defense.

¶24.    The decision to give or refuse jury instructions is within the discretion of the trial court, and the well-settled standard of review is abuse of discretion. *Moody v. State*, 202 So. 3d 1235, 1236-37 (¶7) (Miss. 2016). "Jury instructions must fairly announce the law of the case and not create an injustice against the defendant." *Davis v. State*, 18 So. 3d 842, 847 (¶14) (Miss. 2009). "A criminal defendant is entitled to present his defense to the finder of fact." *Keys v. State*, 635 So. 2d 845, 848 (Miss. 1994).

¶25.    Jury instruction S-3 states:

> The Court instructs the jury that if a person provokes a difficulty, arming himself in advance, and intending, if necessary, to use his weapon and overcome his adversary, he becomes the aggressor and deprives himself of the right of self defense.
>
> If you believe from the evidence beyond a reasonable doubt that the Defendant, Jeffrey Horn, provoked a difficulty with the alleged victim after having armed himself with a deadly weapon in advance of pursuing Ms.

12

Higginbotham through the house into the bedroom and intended, if necessary, to use such weapon and overcome Ms. Higginbotham, then Defendant cannot claim self defense.

The defense objected to S-3, and a discussion ensued. The State maintained it was a correct statement of the law. The trial judge stated he wanted to give an instruction on this theory of the law, and he wanted the parties to agree on the facts in the second paragraph of the instruction—that Horn pursued Regenia down the hall. The defense did not object to that portion, and the instruction was given. Other jury instructions given included aggravated assault, self-defense, and the definition of "reasonableness."

¶26.    During deliberations, the jury sent the following note to the trial judge: "If Mr. Horn armed himself could he have been arming himself to defend himself and still be innocent instead of calling it provoking the situation?" After a discussion with both counsel, the trial court declined to clarify the instruction.

¶27.    The purpose of a pre-arming instruction is "to inform the fact-finder that one cannot arm himself in advance when he is not in any physical danger, go forth and provoke a confrontation or difficulty with another, shoot the other, and then attempt to hide behind a smoke screen of self-defense." *Hart v. State*, 637 So. 2d 1329, 1337 (Miss. 1994). However, the Mississippi Supreme Court has cautioned that pre-arming instructions only be used in "extremely rare incidents where the instruction [i]s supported by the evidence" because this type of instruction can prevent the jury from considering the defendant's theory of the case on self-defense. *Dew v. State*, 748 So. 2d 751, 754 (¶19) (Miss. 1999).

13

¶28. Horn claims that the pre-arming instruction nullified his self-defense instruction. In the numerous cases where a conviction has been reversed for a pre-arming instruction, there is usually no evidentiary basis, or an ambiguity, that the defendant pursued the victim, or no evidence the defendant intended to provoke a confrontation. *See Jobe v. State*, 97 So. 3d 1267, 1270 (¶12) (Miss. Ct. App. 2012) (discussing facts of cases where self-arming instruction has been approved or denied). However, in the rare instances where this evidence is present, the Mississippi Supreme Court and this Court have approved a self-arming instruction. *See Hart*, 637 So. 2d at 1337; *Hall v. State*, 420 So. 2d 1381, 1385 (Miss. 1982); *Reid v. State*, 301 So. 2d 561, 564 (Miss. 1974); *Jobe*, 97 So. 3d at 1270 (¶14).

¶29. Here, the pre-arming instruction was supported by the evidence, including the defendant's own testimony. The testimony of both parties shows Horn was in no physical danger from Regenia, and she was not provoking him, when Horn armed himself by grabbing a gun from on top of the cabinet in the utility room. Regenia testified that he suddenly "pulled the gun from his back" on her, and then she ran toward the back of the house. Additionally, Horn testified that he was sitting in a chair in the utility room when Regenia became angry and ran to the back of the house. Horn explained that he grabbed his gun because he "knew" she was running to the back of the house to get the gun from under the mattress. But she did not provoke him. In both scenarios, Regenia was running down the hall unarmed, and Horn was following her, armed. Further, Horn never abandoned his

14

pursuit of Regenia down the hall or withdrew from the encounter, but instead he followed her with his gun.

¶30. Horn's theory of self-defense was not preempted. The jury was given a self-defense instruction, but rejected this theory. The trial court did not abuse its discretion in granting the pre-arming instruction.

### III.   Juror No. 1's Relationship to the Victim

¶31. Horn argues he is entitled to a new trial because during voir dire Juror 1 failed to inform the trial judge that his wife was Regenia's supervisor at Trace Regional Hospital in Houston, Mississippi.

¶32. During voir dire, when clearly and specifically asked by the trial judge, none of the potential jurors admitted they had any knowledge of, affiliation or social or family connection with, the alleged victim. After trial, during the hearing on Horn's motion for a JNOV or a new trial, Horn's sister, Shannon Carter, testified that Juror 1's wife was Regenia's direct supervisor at the hospital where Regenia worked. Carter also worked at that hospital, and she submitted an affidavit about the relationship, which was attached to the post-trial motion. No affidavit or testimony was ever presented from Juror 1 or his wife. Carter testified she was not present during voir dire, and there is no information in the record about when the relationship was discovered.

¶33. The Mississippi Supreme Court has articulated the analysis for whether a new trial should be granted in this situation:

15

[W]here . . . a prospective juror in a criminal case fails to respond to a relevant, direct, and unambiguous question presented by defense counsel on voir dire, although having knowledge of the information sought to be elicited, the trial court should, upon motion for a new trial, determine whether the question propounded to the juror was (1) relevant to the voir dire examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited. If the trial court's determination of these inquiries is in the affirmative, the court should then determine if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror's failure to respond. If prejudice reasonably could be inferred, then a new trial should be ordered.

*Sewell v. State*, 721 So. 2d 129, 137 (¶43) (Miss. 1998) (quoting *Odom v. State*, 355 So. 2d 1381, 1383 (Miss. 1978)). Further, "no precise formula exists for answering these three questions . . . the trial court must make an ad hoc determination based on the facts before it." *Id.*

¶34. Here, the first two prongs are met—the inquiries were relevant to voir dire and unambiguous; however, whether the juror had substantial knowledge of the information is questionable. The trial court did not enter a detailed order analyzing the issues of Horn's post-trial motion, but did make findings from the bench at the hearing. The judge stated:

I'm going to assume that at that point in the proceedings somebody had said that the victim in this case worked at the Houston hospital. I don't know that to be the case. When that question was asked, do you know the defendant in this case; do you know the alleged victim in this case, I don't know at that point in response to those questions whether or not juror number one even knew the hospital was in issue at that time; so at this point I'm going to find that that's not a valid grounds for a new trial or verdict of acquittal notwithstanding the verdict.

While the judge did not have the transcript before him in making this ruling, our review of the voir-dire transcript confirms that at the time the judge asked the jurors whether they

16

knew the victim, her place of employment had not been mentioned. Later during voir dire, when the prosecutor asked if anybody knew Regenia, he stated she was a nurse at Trace Family Clinic. While Juror 1 did not respond, there is no information in the record that he knew Regenia. Moreover, Carter's affidavit merely represented that the relationship existed between Regenia and the wife of Juror1; it did not allege that the juror knew her or knew of his wife's relationship with her. Nor does it appear that substantial prejudice could be inferred from the juror's failure to respond. Therefore, the trial court did not err in finding Horn had a fair and impartial jury, and he is not entitled to a new trial.

### IV. Cumulative Error

¶35. Lastly, Horn argues the errors that occurred in his case, when taken together, warrant reversal. The cumulative-error doctrine states: "[I]ndividual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Ross v. State*, 954 So. 2d 968, 1018 (¶138) (Miss. 2007). "However, where there is no error in part, there can be no reversible error to the whole." *Harris v. State*, 970 So. 2d 151, 157 (¶24) (Miss. 2007). Since we have found the trial court committed no individual errors, there is no cumulative error.

¶36. Based upon the foregoing, we affirm Horn's conviction and sentence.

¶37. **AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., CARLTON, FAIR, WILSON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**

17